IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

WILLIAM VANN,                    )
                                 )
            Plaintiff,           )
                                 )
    v.                           )   Case No. 10-3349-CV-S-REL-SSA
                                 )
MICHAEL J. ASTRUE, Commissioner)
of Social Security,              )
                                 )
            Defendant.           )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff William Vann brings this suit challenging the
Commissioner's final administrative decision denying his
application for supplemental security income under Title XVI of the
Social Security Act (Act), 42 U.S.C. §§ 1381-1383f. Section
1631(c)(3) of the Act provides for judicial review of the
Commissioner's final administrative decisions under Title XVI of
the Act.

Plaintiff argues that the Administrative Law Judge (ALJ) erred
by (1) finding Plaintiff's allegations of disabling conditions not
fully credible; (2) computing Plaintiff's residual functional
capacity (RFC); (3) failing to give controlling weight to the
opinions of Plaintiff's treating psychiatrist; and (4) failing to
resolve an alleged conflict between the vocational expert's
testimony and the DOT Dictionary of Occupational Titles. I find
that the ALJ did not err in any of these respects, and therefore
plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

### I. BACKGROUND

On June 29, 2007, Plaintiff filed an application for disability benefits with the Social Security Administration (Tr. 10). After Plaintiff's application was initially denied by the agency, Plaintiff requested a hearing by an ALJ (Tr. 41-46). The hearing was held on May 27, 2009 (Tr. 17-39), and on August 14, 2009, the ALJ found that Plaintiff was not disabled and thus not entitled to disability benefits through the date of the decision (Tr. 10-16). On September 16, 2009, Plaintiff appealed to the Appeals Council (Tr. 5), and on July 17, 2010, the Appeals Council denied Plaintiff's request for review (Tr. 1-3). Therefore, the decision of the ALJ stands as the Commissioner's final action.

On September 2, 2010, Plaintiff filed this suit challenging the Commissioner's final administrative decision denying his application for supplemental security income under the Act.

### II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is

2

supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not

3

less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

>Yes = not disabled.
>No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>No = not disabled.
>Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

>Yes = disabled.
>No = go to next step.

4

4.   Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commis-
sioner.

5.   Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

### IV.  THE RECORD

The record consists of the testimony of plaintiff and a vocational expert, Trudy Matilde, in addition to documentary evidence admitted at the hearing.

### A.  ASSESSMENTS AND MEDICAL REPORTS

The record contains the following assessments and medical reports:

On September 25, 2007, Alan Aram, Psy.D., a Social Security consultant, filled out a Psychiatric Review Technique. The doctor opined that Plaintiff's mental impairments were not severe. The doctor considered Plaintiff's impairments under listings 12.02 ADHD, 12.04 Bipolar disorder, currently depressed, and 12.10 Asperger's disorder. The doctor also felt that Plaintiff had a mild degree of restriction in his daily living, maintaining social functioning and maintaining concentration, persistence, and pace (Tr. 403-04, 406, 410-11).

On September 27, 2007, a medical report to the Missouri Department of Social Services was *probably* completed by Elizabeth

5

Bhargava, M.D.[1] Plaintiff's primary diagnoses were bipolar disorder and ADHD. His secondary diagnoses were nonverbal learning disorder and Asperger's disorder. It was noted that Plaintiff had poor motivation, mood swings, significant interpersonal issues, and poor hygiene. Plaintiff was assessed as having a medical disability that would prevent him from engaging in employment for 13 months or more (Tr. 420).

On February 29, 2008, Elizabeth Bhargava, M.D., filled out another medical report. The primary diagnoses were bipolar disorder and ADHD. The secondary diagnosis was Asperger's disorder. The findings included significant problems with interpersonal interactions, ability to focus, and mood swings. Plaintiff was again assessed as having a medical disability that would prevent him from engaging in employment for 13 months or more (Tr. 459-60).

On May 18, 2009, Elizabeth Bhargava, M.D., Plaintiff's psychiatrist at Ozark Medical Center, completed a Mental Medical Source Statement. Dr. Bhargava assessed Plaintiff with the following limitations: moderately limited in remembering locations and work-like procedures, carrying out very short and simple instructions, performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being

---

[1]It is not clear who signed the report (Tr. 420).

distracted by them, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, responding appropriately to changes in the work setting, traveling to unfamiliar places or using public transportation, and setting realistic goals or making plans independently of others; and markedly limited in understanding, remembering, and carrying out detailed instructions, and maintaining concentration and attention for extended periods (Tr. 487-88).

### B. SUMMARY OF MEDICAL AND VOCATIONAL RECORDS

In 2002, Plaintiff was seen 17 times by Aaron Allen, L.P.C., at Genesis Counseling Center. During these sessions, Plaintiff described himself as a person with few friends who felt like an outcast. Plaintiff had classmates who picked on him. Plaintiff said that his mother treated him like a five year old. He and his mother fight to resolve a power struggle between them (Tr. 134-36, 38). The counselor noted that both Plaintiff and his mother focused

on the negative and worst-case scenario of their situation (Tr. 130-33). Plaintiff also reported problems with concentrating, and he was noted to be an angry and bitter individual (Tr. 121, 127-29). Plaintiff reportedly had a low opinion of himself and others, and did not trust anyone (Tr. 126).

On September 6, 2002, Plaintiff saw Aaron Allen, L.P.C., at Genesis Counseling Center, and the counselor assessed a Global Assessment of Functioning (GAF) score of 60[2] (Tr. 125).

On October 7, 2002, Plaintiff went to Aaron Allen, L.P.C., at Genesis Counseling Center and received a GAF score of 62[3] (Tr. 122).

In 2003, Plaintiff was seen 16 times by Aaron Allen, L.P.C., at Genesis Counseling Center. It was noted Plaintiff's relationship with his mother had gotten worse. It was noted Plaintiff had a hard time getting up in the morning and was distracted from doing his chores (Tr. 103, 115, 118). Most of the sessions concerned the poor relationship between Plaintiff and his mother, and their constant

---

[2]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[3]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

8

fighting (Tr. 103-18).

On October 21, 2003, Plaintiff saw Aaron Allen, L.P.C., at Genesis Counseling Center, and it was noted that Plaintiff was getting more depressed and frustrated at school (Tr. 105).

On November 4, 2003, Plaintiff went to Aaron Allen, L.P.C., at Genesis Counseling Center, and the counselor noted that Plaintiff was more depressed than he had been (Tr. 104).

In 2004, Plaintiff was seen 16 times by Aaron Allen, L.P.C., at Genesis Counseling Center . The major issue was the fighting between him and his mother. Plaintiff also struggled at school and with getting his homework done (Tr. 87-102).

On January 24, 2005, Plaintiff went to the Ozark Medical Center and he was treated for the flu. Plaintiff was 5'7" tall and weighed 197 pounds (Tr. 229).

On January 15, 2004, Plaintiff went to William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and complained that he had concentration problems and felt exhausted, despite having slept enough. Plaintiff stated that his condition had worsened due to his new school, but the medication helped with his concentration. Plaintiff reported struggling with his grades. Plaintiff was assessed with ADHD and oppositional defiant disorder, and give a GAF score of 55[4] (Tr. 341-42).

---

[4]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or

9

On December 3, 2004, Plaintiff saw Andreea Arvinte, M.D., at Ozark Medical Center Behavioral Healthcare; Dr. Arvinte diagnosed him with ADHD, combined type, depressive disorder and narcissistic personality traits. Plaintiff was noted to be stable and not experiencing side effects from his medications (Tr. 272).

On February 2, 2005, Plaintiff was seen by Aaron Allen, L.P.C., at Genesis Counseling Center, and seemed to be groggy and depressed. Plaintiff stated that his medication only helps keep him from hurting himself. Plaintiff reported that he had no friends and did not want friends for fear of being hurt (Tr. 455).

On February 17, 2005, Plaintiff went to Aaron Allen, L.P.C., at Genesis Counseling Center, and reported that he was still depressed due to a lot of homework, but he was doing better with his mother (Tr. 454).

On February 25, 2005, Plaintiff returned to Andreea Arvinte, M.D., at Ozark Medical Center Behavioral Healthcare, and he had the same diagnosis, i.e., ADHD, combined type, depressive disorder and narcissistic personality traits, with an assessment of depression (Tr. 270).

On March 10, 2005, Plaintiff saw Aaron Allen, L.P.C., at Genesis Counseling Center, and the main issue was Plaintiff's lack of trust with others and his fear of making friends (Tr. 453).

---

school functioning (e.g., few friends, conflicts with peers or co-workers).

On March 27, 2005, Plaintiff was seen at the Ozark Medical Center and was treated for a fever and leukocytosis[5] (Tr. 228).

On April 6, 2005, Plaintiff was seen by Andreea Arvinte, M.D., at Ozark Medical Center Behavioral Healthcare, and he had the same diagnosis (i.e., ADHD, combined type, depressive disorder and narcissistic personality traits) but was stable (Tr. 269). The doctor noted that Plaintiff was "not depressed" and was "doing well" (Tr. 269).

On April 11, 2005, Plaintiff was seen at the Ozark Medical Center for an upper respiratory infection (Tr. 227).

On May 12, 2005, Plaintiff returned to Aaron Allen, L.P.C., at Genesis Counseling Center, and it was noted that things had worsened with his mother and they had started calling each other names. Plaintiff also stated that he hated the students and teachers at his school (Tr. 452).

On June 23, 2005, Plaintiff saw Aaron Allen, L.P.C., at Genesis Counseling Center, and reported that he had given up on everything and was burned out. Plaintiff reportedly was verbally assaulting his mother when she made him angry (Tr. 451).

On June 29, 2005, Plaintiff saw Thomas Thomas, M.D., at Ozark Medical Center Behavioral Healthcare, and Dr. Thomas diagnosed him with ADHD, combined type and bipolar disorder type one most recent episode mixed and severe (Tr. 267).

---

[5]Leukocytosis is a raised white blood cell count level.

11

On July 26, 2005, Plaintiff visited with Aaron Allen, L.P.C., at Genesis Counseling Center, and said that he was switching therapists to someone at his psychiatrist's office. Plaintiff indicated his big issues were still his mother and school (Tr. 450).

On August 15, 2005, Plaintiff saw Thomas Thomas, M.D., at Ozark Medical Center Behavioral Healthcare, and he was noted to be doing poorly and was assessed with significant axis two pathology and untreated ADHD, and possible bipolar disorder (Tr. 266).

On August 16, 2005, Plaintiff saw Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and Mr. Nixon diagnosed bipolar one, depressed. The therapist noted Plaintiff's mood and affect were pensive. Plaintiff complained of hypnogogic[6] hallucinations, anger problems and feeling isolated. Plaintiff was assessed a GAF score of 34-37[7] (Tr. 313).

On September 15, 2005, Plaintiff returned to Thomas Thomas, M.D., at Ozark Medical Center Behavioral Healthcare, and he was assessed as being slightly under medicated for his ADHD

---

[6]Occurring between being awake and falling asleep.

[7]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

12

concentration problems (Tr. 265). Dr. Thomas noted that Plaintiff, who had been ruminating about suicide, was "feeling much better" (Tr. 265, 267).

On September 16, 2005, Plaintiff returned to Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the diagnosis was bipolar disorder type one depressed and ADD. It was noted Plaintiff's mood and affect were pensive. The GAF score was 34-37[8] (Tr. 312).

On September 22, 2005, Plaintiff saw Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and he was diagnosed with bipolar disorder one depressed, and was noted to have a sullen mood and affect. Plaintiff discussed problems at school from taunting by other students. Plaintiff's GAF score was 34-37[9] (Tr. 311).

On October 14, 2005, Plaintiff saw Kenneth Gladieux, M.D., and

---

[8]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[9]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

13

Dr. Gladieux noted Plaintiff's affect was mildly blunted, but otherwise his ADHD was not causing any untoward symptoms (Tr. 264). The doctor noted that Plaintiff had a stable and neutral mood (Tr. 264).

On October 19, 2005, Plaintiff went to Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the diagnosis was the same (i.e., bipolar disorder one depressed) but with a normal mood and affect. Plaintiff's GAF score had increased to 48-50[10] (Tr. 310).

On October 28, 2005, Plaintiff saw Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and he had the same diagnosis (i.e., bipolar), but his GAF score had increased to 51-53[11] (Tr. 309).

On November 11, 2005, Plaintiff returned to Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and his diagnosis and GAF score were the same (i.e., bipolar and GAF 51-

_____

[10]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[11]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) <u>or</u> moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

53[12]), but he had a sullen mood and affect resulting from problems with his family (Tr. 308).

On November 21, 2005, Plaintiff went to Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and it was noted his height was 5' 8" and his weight was 232 pounds. Plaintiff's mood and affect were generally pensive. Plaintiff reported nightmares about every other night. Plaintiff was off by three days on the current date. It was noted that Plaintiff had occasional suicidal and homicidal thoughts, but he would not act on them. The diagnosis was bipolar disorder, type one and most recent episode depressed, a history of attention deficit hyperactivity disorder, a history of oppositional defiant disorder, and ruled out personality disorder with a GAF of 51-53[13] (Tr. 337-39).

On November 30, 2005, Plaintiff returned to Thomas Thomas, M.D., at Ozark Medical Center Behavioral Healthcare, and he was diagnosed with ADHD, combined type and bipolar disorder, type one most recent episode depressed. Plaintiff was considered stable (Tr. 263).

---

[12]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[13]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

On December 15, 2005, Plaintiff returned to Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the diagnosis was bipolar disorder, one and most recent episode depressed, a GAF of 51-53[14], but his mood and affect were still sullen (Tr. 307).

On December 28, 2005, Plaintiff saw Thomas Thomas, M.D., at Ozark Medical Center Behavioral Healthcare, and the diagnosis was ADHD, combined type, and it was noted he could use an increase in his Zoloft[15] because he still felt numb at times (Tr. 261).

On January 20, 2006, Plaintiff saw Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the diagnosis and GAF score were the same, i.e., bipolar and GAF of 51-53[16], but he still had a sullen mood and affect (Tr. 305). The therapist noted that Plaintiff was not suicidal or homicidal (Tr. 302-03, 306).

On January 24, 2006, Plaintiff was treated the Ozark Medical Center for a sore throat. Plaintiff was 5'11" tall and weighed 241 pounds (Tr. 226).

---

[14]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[15]Zoloft is used to treat depression.

[16]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

16

On February 3, 2006, Plaintiff went to Tom Nixon, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and Mr. Nixon had the same findings (i.e., bipolar and GAF of 51-53[17]) except the therapist also observed anger and resentment from Plaintiff (Tr. 303).

On February 13, 2006, Plaintiff was treated at the Ozark Medical Center for pharyngitis and rhinosinusitis[18] (Tr. 225).

On February 23, 2006, Plaintiff saw Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and Dr. Gowin diagnosed him with Asperger's syndrome[19] and ADHD (Tr. 260).

On March 10, 2006, Plaintiff saw Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and the diagnosis was the same (i.e., Asperger's and ADHD), but he was doing better (Tr. 258).

On March 21, 2006, Plaintiff saw David Evans, L.P.C., who noted the same diagnosis (i.e., bipolar disorder), but that Plaintiff had a depressed and anxious mood and affect along with a

_____

[17]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[18]Rhinosinusitis is an inflammation of the paranasal sinuses.

[19]Asperger's syndrome is a form of autism characterized by significant difficulty in social interaction.

17

drop in his GAF score to 48-50[20] (Tr. 301).

On March 30, 2006, Plaintiff saw Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and he was noted to be more depressed due to school and not being able to relate to other students (Tr. 253). The doctor noted difficulty in getting Plaintiff to take his medication (Tr. 253).

On April 7, 2006, Plaintiff returned to Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and it was noted that Plaintiff never started his medications, but that overall things were stable (Tr. 253).

On April 19, 2006, Plaintiff was treated at the Ozark Medical Center for sinusitis, dizziness, BSOM and Eustachian tube dysfunction (Tr. 224).

On April 28, 2006, Plaintiff was seen at the Ozark Medical Center for allergic rhinitis (Tr. 223).

On May 4, 2006, Plaintiff visited Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and he complained of problems with school and at home with his mother. Plaintiff was noted to be very tired, lethargic, and irritable. The impression was major depressive disorder, Asperger's disorder, and ADHD (Tr. 254).

On May 12, 2006, Plaintiff returned to Donna Gowin, M.D., at

---

[20]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

18

Ozark Medical Center Behavioral Healthcare, and it was noted that he was doing better and his GAF score was 60[21] (Tr. 254).

On May 14, 2006, Plaintiff was treated at the Ozark Medical Center for atypical pneumonia (Tr. 222).

On May 26, 2006, Plaintiff saw Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and the doctor noted that he was hypomanic[22] and not sleeping well (Tr. 255).

On June 15, 2006, Plaintiff saw Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and his diagnosis was bipolar depression, ADHD, combined type, and probable Asperger's disorder. Plaintiff appeared to be more depressed and was feeling hopeless. Plaintiff was assessed a GAF score of 50[23] (Tr. 256).

On June 29, 2006, Plaintiff returned to Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and his mood was better, and he was assessed with a GAF score of 65[24] (Tr. 255).

---

[21]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[22]Hypomanic is a mood state characterized by persistent and pervasive elevated or irritable mood.

[23]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[24]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some

On July 19, 2006, Plaintiff saw Jeanne McAllister, Ph.D.; Dr. McAllister noted his mood and affect were angry and resentful. Plaintiff appeared very irritable and displayed poor social skills. The diagnosis was ADHD and Asperger's disorder with a GAF score of 38-40[25] (Tr. 299).

On July 26, 2006, Plaintiff saw Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and was noted to be relatively stable, but his GAF score was 50[26] (Tr. 250).

On August 7, 2006, Plaintiff returned to Jeanne McAllister, Ph.D., and he was given an IQ test. It was noted Plaintiff's mood was somber with constricted affect. Plaintiff had poor eye contact and showed little interest in social interaction. Plaintiff displayed some obsessive-compulsive traits in his responses. The results showed Plaintiff with a verbal IQ of 127, a performance IQ

---

difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[25]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[26]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

20

of 102, and a full-scale IQ of 116 (Tr. 213), indicating that he
performed in the superior to average range intellectually, and had
higher verbal skills than performance skills. Plaintiff had
relative weaknesses in visual and auditory short-term memory,
numerical reasoning, concentration, attention, processing speed and
speed and accuracy of eye-hand coordination. The doctor observed
that Plaintiff had "excellent social comprehension and judgment and
common sense" (Tr. 213). Plaintiff was assessed with Attention
Deficit disorder (ADD), inattentive type, bipolar disorder,
nonverbal learning disorder, but ruled out obsessive-compulsive
disorder; and was given a GAF score of 55[27] (Tr. 326-27). Due to his
ADD, the doctor recommended Plaintiff sit close to the teacher and
away from distractions such as pencil sharpeners. Prompts such as
talking to him directly or touching him while talking were also
recommended to help him stay on task. The doctor recommended that
Plaintiff hear instructions more than once and that he be allowed
to take tests in a quiet place free of distractions. The doctor
observed that people with nonverbal learning disorder are noted to
have problems with visual-spatial organization, motor functioning
and social ineptness. Because of these conditions, Plaintiff will
appear awkward and have problems with fine and gross motor skills;

---

[27]A global assessment of functioning of 51 to 60 means moderate
symptoms (e.g., flat affect and circumstantial speech, occasional
panic attacks) or moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or co-
workers).

persons with this disorder also tend to have problems getting from one place to another or changing tasks; and they miss subtle nonverbal social cues and have problems learning from experience (Tr. 328).

On August 24, 2006, Plaintiff had an appointment with Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and it was noted he had gained 23 pounds in a month. The impression was Asperger's disorder, major depressive disorder, and bipolar disorder currently stable, ADHD, and a GAF score of 55[28] (Tr. 250).

On September 7, 2996, Plaintiff saw Jeanne McAllister, Ph.D., who noted that he had a somber mood but no suicidal or homicidal ideation (Tr. 324-25).

On September 22, 2006, Plaintiff returned to Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and he was more depressed and having trouble with concentration. Plaintiff admitted to ongoing suicidal ideation. The impression was bipolar disorder with severe depression, Asperger's disorder, and ADHD, with a GAF score of 38-40[29] (Tr. 251).

---

[28]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[29]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects

On September 24, 2006, Plaintiff underwent as assessment at a medical center and was found to have poor judgment but a euthymic mood[30] and good concentration (Tr. 204-08).

On September 25, 2006, Plaintiff had an appointment with Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and he reported poor energy and never feeling rested even with extra sleep. On a scale of 1 to 10, with 10 being the highest, Plaintiff rated his depression an 8 and his anxiety a 4. It was noted he had a guarded appearance and constricted affect. Plaintiff's judgment and insight were rated as poor. The diagnosis was bipolar one, depressed, ADHD, and Asperger's disorder with a GAF score of 60[31] (Tr. 318, 321-22).

On September 25, 2006, Plaintiff was treated at the Ozark Medical Center for impacted cerumen and sinusitis (Tr. 221).

On September 29, 2006, Plaintiff saw Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and he was still very depressed. The impression was the same (i.e., bipolar disorder,

---

family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[30]Euthymic mood is a normal non-depressed, reasonably positive mood.

[31]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 23 of 58

depressed, ADHD, Asperger's) and the GAF score was 35-40[32] (Tr. 249).

On October 14, 2006, Plaintiff was seen at the Ozark Medical Center for a cough (Tr. 220).

On November 6, 2006, Plaintiff returned to Donna Gowin, M.D., at Ozark Medical Center Behavioral Healthcare, and he was still depressed and his GAF score was 35-40[33]. The impression was bipolar, depressed, and Asperger's (Tr. 248).

On November 15, 2006, Plaintiff returned to Jeanne McAllister, Ph.D., and he was tested again. Plaintiff's mood was somber and his affect was blunted. Plaintiff was somewhat obsessive in responding to questions, which resulted in the testing taking longer than usual. Plaintiff did well in all subjects but calculation. The diagnostic impression was ADD, inattentive type, bipolar disorder, nonverbal learning disorder, and ruled out obsessive-compulsive

---

[32]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[33]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

24

disorder, with a GAF score of 55-60[34] (Tr. 314-16).

On December 22, 2006, Plaintiff saw Jeanne McAllister, Ph.D., and Dr. McAllister diagnosed him with ADHD and Asperger's disorder and his GAF score decreased to 48-50[35] (Tr. 297).

On January 9, 2007, Plaintiff saw Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and Dr. Bhargava diagnosed him with bipolar disorder currently depressed, Asperger's disorder and ADHD. It was noted he had a depressed mood, restricted affect and was mildly psychomotor retarded. The assessment was continued severe symptoms and a GAF score of 50[36] (Tr. 246).

On January 11, 2007, Plaintiff went to Jeanne McAllister, Ph.D., and he was noted to have a depressed and anxious mood and affect. Plaintiff's diagnosis was bipolar one, depressed and ADHD,

---

[34]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[35]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[36]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 25 of 58

and his GAF score 48-50[37] (Tr. 295).

On January 16, 2007, Plaintiff was treated at the Ozark Medical Center for tendonitis in his left knee. Plaintiff was 5' 9 ½" tall and weighed 290 pounds (Tr. 219).

On February 15, 2007, Plaintiff saw Jeanne McAllister, Ph.D., and she noted that his mood and affect were depressed. The diagnosis was bipolar disorder type one, depressed, with a GAF score of 58-60[38] (Tr. 293).

On February 22, 2007, Plaintiff returned to Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and she noted that he was less depressed, and assessed a GAF of 62[39]. The diagnosis was bipolar disorder (Tr. 244). The doctor noted that Plaintiff was doing much better (Tr. 244).

On March 9, 2007, Plaintiff returned to Jeanne McAllister,

---

[37]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[38]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[39]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

26

Ph.D., and she diagnosed ADHD with somber mood and affect. The GAF score was 48-50[40] (Tr. 291).

On March 22, 2007, Plaintiff had an appointment with Jeanne McAllister, Ph.D., and she diagnosed bipolar disorder type one depressed and ADHD with a depressed mood and affect. The GAF score remained at 48-50[41] (Tr. 289).

On March 29, 2007, Plaintiff followed up with Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare; his diagnosis was bipolar disorder and he was seen as fairly stable with a GAF score of 65[42] (Tr. 242). Plaintiff was "doing alright" (Tr. 242).

On April 15, 2007, Plaintiff was treated at the Ozark Medical Center for gastroenteritis. Plaintiff weighted 278 pounds (Tr. 218).

---

[40]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[41]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[42]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) <u>or</u> some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

On April 20, 2007, Plaintiff returned to Jeanne McAllister, Ph.D., and his diagnosis was the same (i.e., bipolar disorder and ADHD). Plaintiff had a depressed mood and affect with a GAF score of 48-50[43] (Tr. 287).

On April 27, 2007, Plaintiff followed up with Jeanne McAllister, Ph.D., and his diagnosis was ADHD with the GAF score of 48-50[44] (Tr. 285).

On May 4, 2007, Plaintiff returned to Jeanne McAllister, Ph.D., and he was diagnosed with ADHD and bipolar disorder, his GAF score was 58-60[45], and his mood and affect were somber (Tr. 283).

On May 11, 2007, Plaintiff saw Jeanne McAllister, Ph.D.; his diagnosis was ADHD, and he had a GAF score was 54-57[46]. Plaintiff

---

[43]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[44]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[45]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[46]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

was noted to have poor self esteem, depressed mood, and difficulty organizing (Tr. 281).

On May 17, 2007, Plaintiff returned to Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and the diagnosis was bipolar disorder, but he was still doing fine. His GAF was 64[47] (Tr. 240). Plaintiff reported graduating from high school (Tr. 240).

On June 1, 2007, Plaintiff returned to Jeanne McAllister, Ph.D., and he was doing better with a diagnosis of ADD and a GAF score of 58-60[48] (Tr. 279).

On June 7, 2007, Plaintiff had an appointment with Jeanne McAllister, Ph.D., and his diagnosis was ADHD, and his mood and affect were depressed. Plaintiff's GAF score was 48-50[49] (Tr. 277).

On June 18, 2007, Plaintiff saw Jeanne McAllister, Ph.D., and

---

[47]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[48]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[49]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 29 of 58

his diagnosis was bipolar disorder type one depressed. Plaintiff had a depressed mood and affect. Plaintiff's GAF score was 51-53[50] (Tr. 275).

On July 23, 2007, Plaintiff returned to Jeanne McAllister, Ph.D., and his diagnosis was the same (i.e., bipolar disorder), but his GAF score was 48-50[51] (Tr. 273). The doctor noted that Plaintiff was depressed but not suicidal or homicidal (Tr. 273).

On August 17, 2007, Plaintiff saw William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and Mr. Dugan diagnosed bipolar disorder depressed. Plaintiff was noted to have a reserved and distracted mood. The GAF score was 44-47[52] (Tr. 345).

On August 25, 2007, Plaintiff was seen at the Ozark Medical Center for a skin infection (Tr. 425).

On September 13, 2007, Plaintiff returned to William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare and his

---

[50]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[51]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[52]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

30

diagnosis was bipolar disorder, and his GAF was 44-47[53]. Plaintiff's mood and affect were depressed (Tr. 343).

On September 27, 2007, Plaintiff saw Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and he was diagnosed with bipolar disorder, currently depressed, Asperger's disorder, ADHD and non-verbal learning disability. Plaintiff had a depressed mood. Plaintiff had a GAF score of 58[54] (Tr. 457). The doctor noted that Plaintiff was focused on getting disability and reported that he was not doing well (Tr. 457).

On January 8, 2008, Vocational Rehabilitation noted that Plaintiff's vocational barriers were impaired social skills, difficulty with authority, diminished stress tolerance, lack of self-discipline, lack of consistent emotional behavior, failure to interact well with others, extreme mood swings, and fits of rage (Tr. 478). Plaintiff's strengths were above-average verbal aptitude, high-average clerical perception, and ability to learn routine procedures. Plaintiff reportedly learns best with visual language and social individual learning approaches. It was noted

---

[53]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[54]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Plaintiff does best when he is working or learning alone (Tr. 479). Plaintiff was noted to have personal hygiene issues, such as body odor and dirty clothing (Tr. 480).

On January 9, 2008, Plaintiff saw Heather Crank, L.P.C., at Ozark Medical Center Behavioral Healthcare, and Ms. Crank diagnosed him with ADHD, Asperger's disorder, and bipolar disorder, type one, depressed. Plaintiff's mood and affect were depressed. His GAF score was 61-63[55] (Tr. 447).

On January 18, 2008, Plaintiff saw Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and the diagnosis was Bipolar disorder, currently depressed, Asperger's disorder, and ADHD. Plaintiff had a moderately depressed mood and mildly restricted affect, and his GAF score was 60[56] (Tr. 446).

On February 29, 2008, Plaintiff saw Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and he had the same impairments (i.e., bipolar disorder, Asperger's, and ADHD); his GAF

---

[55]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[56]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

score was 60[57] (Tr. 444).

On February 29, 2008, Plaintiff returned to Heather Crank, L.P.C., at Ozark Medical Center Behavioral Healthcare, and he was assessed the same impairments (i.e., bipolar disorder, Asperger's, and ADHD). Plaintiff's mood and affect were depressed, but his GAF score was 61-63[58] (Tr. 445).

On March 27, 2008, Plaintiff returned to Heather Crank, L.P.C., at Ozark Medical Center Behavioral Healthcare, and Ms. Crank's findings were the same as the last session with a GAF 61-63[59] (Tr. 443).

On April 14, 2008, Plaintiff went to William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and his diagnosis was bipolar disorder, depressed, and a depressed mood and affect

---

[57]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[58]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[59]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 33 of 58

was noted. The GAF score was 44-47[60] (Tr. 441).

On May 8, 2008, Plaintiff returned to Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and it was noted he was fairly stable at a lower level of functioning. The GAF score was 60[61] and his impairments were bipolar disorder, Asperger's, and ADHD (Tr. 440). The doctor noted that Plaintiff had a fairly good mood, and his affect was reactive and appropriate (Tr. 440).

On May 16, 2008, Vocational Rehabilitation assigned Plaintiff the task of answering a three-line phone, cutting paper for programs, and stuffing the programs. Plaintiff's pace was noted as slow, he required several prompts on how to open the cutter all the way and cutting the right amount of paper to increase his pace. Plaintiff referred to the instruction book several times while answering the phone to make sure he was directing the calls to the right person (Tr. 474).

On May 30, 2008, Vocational Rehabilitation assigned Plaintiff to alphabetize forms, file forms, and shred forms. It was noted

---

[60]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[61]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) <u>or</u> moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

that Plaintiff worked at a very slow pace while alphabetizing and that he required prompts and reinforcement with each step of each task (Tr. 473).

On June 4, 2008, Vocational Rehabilitation completed an assessment report on Plaintiff. It was noted Plaintiff's strengths were a positive attitude, punctuality, and good work quality during the assessment activities. Plaintiff's weaknesses were lack of transportation, the need for several prompts to complete tasks correctly, unrealistic desire to work at a computer store, and slower pace than an average worker. Plaintiff was given suggestions on how to increase his speed, but he rejected the advice (Tr. 469-70).

On June 16, 2008, Plaintiff visited William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the therapist had diagnosed bipolar disorder with a GAF score of 44-47[62] (Tr. 438).

On June 19, 2008, a counselor at Vocational Rehabilitation noted that Plaintiff would only be successful if he was willing to participate on a weekly basis and be more realistic on his possibilities (Tr. 466).

On June 25, 2008, Plaintiff was treated at the Ozark Medical

---

[62]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Center for bronchitis. Plaintiff was 5'11" tall and weighed 322 pounds (Tr. 423).

On July 14, 2008, Plaintiff returned to William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the therapist found Plaintiff to be bipolar with severe symptoms; the therapist noted that Plaintiff has been incontinent and not cleaning his underpants (Tr. 437).

On August 1, 2008, a counselor at Vocational Rehabilitation noted that Plaintiff attended an interview for a part-time position as a clerk (Tr. 462).

On August 8, 2008, Plaintiff saw Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and Dr. Bhargava noted that Plaintiff appeared to be about the same, with a GAF of 60[63] (Tr. 436). Plaintiff was reportedly looking for a job (Tr. 436).

On August 12, 2008, Plaintiff went to William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the therapist's findings were Bipolar, depressed mood, with severe symptoms, and a GAF of 60[64] (Tr. 435).

---

[63]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[64]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

36

On September 11, 2008, Plaintiff returned to William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the therapist had the same findings, i.e., bipolar disorder, depressed mood, and severe symptoms, but the therapist also noted Plaintiff's weight had increased to 331 pounds. Plaintiff also displayed grandiose ideas of his talents and unrealistic expectations of his place in the job market (Tr. 434).

On October 17, 2008, Plaintiff returned to Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and he had the same impairments (i.e., bipolar disorder, Asperger's, and ADHD), and his GAF score was 55[65]. The doctor felt that Plaintiff's grandiosity was a defense for his poor self esteem (Tr. 432). The doctor noted that Plaintiff had a grand view of the kind of work he expected to do (Tr. 432).

On December 1, 2008, Plaintiff went to William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the therapist had the same findings, i.e., bipolar disorder, depressed mood, and severe symptoms, but Plaintiff's weight had gone up three pounds since his last session (Tr. 431).

On March 6, 2009, Plaintiff saw Elizabeth Bhargava, M.D., at Ozark Medical Center Behavioral Healthcare, and the doctor's

---

[65]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) <u>or</u> moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

findings were the same as the last session (i.e., bipolar disorder, Asperger's, and ADHD, with a GAF of 55[66]), the doctor observing that she had not seen much change in Plaintiff over the years (Tr. 430).

On April 23, 2009, Plaintiff returned to William Dugan, L.C.S.W., at Ozark Medical Center Behavioral Healthcare, and the therapist diagnosed him as bipolar, depressed with a depressed mood and affect. The GAF score was 44-47[67] (Tr. 429).

### C. SUMMARY OF TESTIMONY

During the hearing, plaintiff testified; Trudy Matilde, a vocational expert, also testified at the request of the ALJ.

### 1. Plaintiff's testimony

Plaintiff testified that he was born on August 11, 1988, and is a U.S. citizen (Tr. 21).

Plaintiff testified that he was then 5' 11" and weighed 320 pounds. Plaintiff reported that he is right-handed. Plaintiff said he has no children and is unmarried (Tr. 21). Plaintiff lives with his mother and has never lived on his own (Tr. 32-33).

Plaintiff testified he has a high school diploma. Plaintiff

---

[66]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) <u>or</u> moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[67]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 38 of 58

said he has never had a driver's license; he relies on his mother or other relatives to drive him wherever he needs to go (Tr. 22).

Plaintiff testified that he speaks, reads, and writes English (Tr. 22-23). Plaintiff said he was not working at the time of the hearing. Plaintiff stated he has never had an regular job (Tr. 23).

Plaintiff testified his mental impairments of bipolar disorder, Asperger's syndrome, and depression prevent him from working. Plaintiff reported that he has seen Dr. Varga for one to two years for counseling once every few months (Tr. 23).

Plaintiff testified that he takes Abilify for his bipolar, Ramadan for acid reflux, and Cymbalta and Wellbutrin for depression (Tr. 24).

Plaintiff testified that he can bathe himself, dress himself, and fix simple meals. Plaintiff said that he occasionally does dishes and can make his bed (Tr. 24).

Plaintiff testified that he goes shopping with his mother. Plaintiff said he can pay for things by himself, but would not know for sure if he has correct change because he counts very slowly (Tr. 25-26).

Plaintiff testified that on his worst days he hates himself and everybody around him due to his depression. Plaintiff stated that if he had a gun he would use it to kill people. On his worst days, Plaintiff said that he wants to die and take as many people with him as possible (Tr. 26).

39

Plaintiff testified that he has bad days related to his depression about two-thirds of the month. Plaintiff said that he will usually stay in bed because he has a hard time relating with others (Tr. 26).

Plaintiff testified that nothing really brings on the bad days. Plaintiff stated that he has mood swings where he will go from feeling normal to feeling very down, and that the littlest thing can set off a mood swing (Tr. 27).

Plaintiff testified that during his bad days, he will sleep on average 16 hours at a time. Plaintiff stated that his spells come with the bad days and last on average one day (Tr. 27-28).

Plaintiff testified that he tends to interpret things people say in a negative way and that he is bad in interpreting social cues (Tr. 28).

Plaintiff testified that he bottles up his anger until he feels suicidal (Tr. 29).

Plaintiff indicated that he slept "[w]ay too much" and did not often leave the house (Tr. 27-29). Plaintiff testified that he gets out of the house on average a few times a month (Tr. 29).

Plaintiff testified that he does not have any friends, just acquaintances who call him every couple of months (Tr. 29).

Plaintiff testified that he hardly does any chores around the house because his depression makes him not care about them (Tr. 30). Similarly, Plaintiff neglects his personal hygiene (Tr. 30).

For example, Plaintiff reportedly bathes every three or four days, and shaves one-to-two-times a month (Tr. 30).

Plaintiff testified that he has difficulty dealing with new situations or unfamiliar places because they make his mind go blank and he wants to flee (Tr. 30-31).

Plaintiff testified that his concentration is bad due to his attention-deficit hyperactivity disorder. Plaintiff reported that he can concentrate for about an hour if the subject matter is interesting; otherwise he has an urge to switch what he is doing. Plaintiff's lack of concentration affects even his television watching (Tr. 31). For example, Plaintiff testified when he is watching television, he is usually pacing and thinking about other things at the same time (Tr. 31).

Plaintiff testified that he has no current hobbies because his depression is too crippling (Tr. 31-32).

Plaintiff testified that his weight gain is due to mental exhaustion and being tired with life (Tr. 32).

Plaintiff testified that his weight affects his ability to do physical activity. For example, Plaintiff stated that after scrubbing a toilet, he feels rubbery and weak in the knees for the rest of the day (Tr. 32).

Plaintiff also noted that his participation in Vocational Rehabilitation "ended primarily because the job market wouldn't cooperate" (Tr. 33). Plaintiff testified that he believed he would

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 41 of 58

not have been able to keep a job even if he had found one (Tr. 33).

### 2. Vocational expert testimony

Vocational expert Trudy Matilde testified at the request of the Administrative Law Judge.

Trudy Matilde testified that Plaintiff did not have past relevant work (Tr. 33-35).

Ms. Matilde assumed a male person, 18 to 20 years of age with the same education and work history as Plaintiff and who had the following limitations: lifting and carrying 50 pounds occasionally, 25 pounds frequently; standing and walking 6 hours of 8 hours total, 1 hour at a time then needs a 5 minute break off his feet; sitting 6 hours out of 8 hours total; would need to change positions every 30 minutes; never climb ladders, ropes, or scaffolds; occasionally climb stairs; occasionally balance, stoop, kneel, crouch and crawl; avoid concentrated exposure to hazardous machinery and unprotected heights; limited to simple, routine, repetitive tasks; low stress tasks with occasional decision making; no changes in work setting; no exercise of judgment; no production rate pace work; limited interaction with the public; occasional interaction with co-workers and limited to superficial, non-confrontational, no arbitration or negotiation type of work. The vocation expert stated that such a person would be capable of performing the jobs of hand packager, medium level, electronic worker and hand packager, light level (Tr. 34-36).

Ms. Matilde testified that if you added to the previous hypothetical that the person required redirection by a supervisor every 2 hours, such a person would not be able to perform any competitive work in the national economy (Tr. 36-37).

Ms. Matilde testified that if a person consistently worked at a slower pace than the average worker and was not flexible in his or her ability to adapt to the working directions from a supervisor, such a person might be unable to maintain employment in the open labor market (Tr. 37-38).

Ms. Matilde testified a person in the unskilled job base on average is allowed only one absence a month (Tr. 38).

### D. FINDINGS OF THE ALJ

On August 14, 2009, ALJ Jeffrey A. Hatfield entered his decision denying Plaintiff's application for supplemental income finding Plaintiff was not disabled under the Act (Tr. 10-16).

The ALJ found that Plaintiff had not engaged in substantial gainful activity as defined by the Act since the date of the application (Tr. 12).

The ALJ found Plaintiff has severe impairments of bipolar disorder, Asperger's syndrome, obesity, and learning disorder (20 C.F.R. 404.1520(c) and 416.920 (c)) (Tr. 12).

The ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix

43

1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920 (d), 416.925 and 416.926) (Tr. 12).

The ALJ found that Plaintiff had the following residual functional capacity: ability to lift and carry 50 pounds occasionally and 25 pounds frequently, stand/walk 1 hour at a time for a total of 6 hours in an 8 hour workday, sit 6 hours in an 8 hour workday with need to alternate sitting and standing every 30 minutes, occasional ramp/stair climbing, no ladder/rope/scaffold climbing, occasionally balance, stoop, kneel and crouch, no crawling and avoidance of concentrated exposure to unprotected heights and dangerous machinery; he is limited to performing simple routine repetitive tasks with limitations to low stress tasks which permit occasional decision-making, occasional changes in the work setting and occasional exercise of judgment, no production rate and pace work, occasional interaction with the public and coworkers and limit to superficial, non-confrontational and non-arbitration/negotiation types of interactions (Tr. 12-13).

The ALJ found Plaintiff's testimony and allegations of complete disability not fully credible (Tr. 14).

The ALJ found that Plaintiff has no past relevant work (20 C.F.R. 404.1565 and 416.965) (Tr. 15).

The ALJ found that Plaintiff was 18 years old, in the age group defined as a younger individual, on the date the application was filed (20 C.F.R. 416.963) (Tr.15).

44

The ALJ found that Plaintiff has at least a high school education and is able to communicate in English (20 C.F.R. 416.968) (Tr. 15).

The ALJ found that Plaintiff had no job skills transferable since he had no past relevant work (20 C.F.R. 416.968) (Tr. 15).

The ALJ found that Plaintiff was able to perform jobs that were in significant numbers in the national economy (20 C.F.R. 416.969 and 416.969a) (Tr. 15).

The ALJ concluded that Plaintiff has not been under a "disability," as defined by the Social Security Act, at any time through the date of the decision (20 C.F.R. 416.920(g)) (Tr. 16).

### V. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible, specifically stating:

> The ALJ committed reversible error in determining claimant's residual functional capacity because he performed an improper credibility analysis per Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) and SSR 96-7p.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility

45

determinations and set forth the inconsistencies which led to his
or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir.
1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If
an ALJ explicitly discredits testimony and gives legally sufficient
reasons for doing so, the court will defer to the ALJ's judgment
unless it is not supported by substantial evidence on the record as
a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit
plaintiff's subjective complaints is supported by substantial
evidence. Subjective complaints may not be evaluated solely on the
basis of objective medical evidence or personal observations by the
ALJ. In determining credibility, consideration must be given to all
relevant factors, including plaintiff's prior work record and
observations by third parties and treating and examining physicians
relating to such matters as plaintiff's daily activities; the
duration, frequency, and intensity of the symptoms; precipitating
and aggravating factors; dosage, effectiveness, and side effects of
medication; and functional restrictions. Polaski v. Heckler, 739 at
1322.

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

> The claimant's subjective complaints and alleged
> limitations are out of proportion to the objective
> findings as noted above. There is no evidence of disuse
> muscle atrophy that would be compatible with the
> claimant's alleged level of inactivity.

46

The claimant's subjective complaints and alleged limitations are not consistent with his activities of daily living. The claimant was looking for a job and the treatment notes indicate that the claimant had difficulty finding a job due to his selectivity and prejudice of certain jobs (e.g, working at McDonalds). The claimant does school work, prepares his own meals, does household chores, mows the lawn and weeds the garden, uses the internet, and goes out regularly to places such as Wal-Mart (Exhibit 4E).

The undersigned has considered the allegations in the third party letters (Exhibits 7E and 8E), but the undersigned does not find any additional limitations based on the allegations therein because they are not consistent with the objective findings or his activities or daily living, as discussed above.

(Tr. 15.)

Although the record supports the conclusion that Plaintiff suffers from bipolar disorder and has often displayed a depressed mood to his treatment providers, there have been no instances in which Plaintiff went to the emergency room or was hospitalized because of his psychological symptoms. In addition, Plaintiff's treating physicians have often noted that he was stable or doing well during his treatment (Tr. 240, 244, 250, 430, 440).

Concerning Plaintiff's other mental disorders, i.e., Asperger's syndrome and ADHD, the evidence is that these conditions are not as disabling as claimed by Plaintiff. For example, Plaintiff was able to graduate from high school, after the alleged onset date, with a grade point average of 2.60 on a 4.00 scale (Tr. 239); although Plaintiff is something of a loner, his psychiatrist noted that he has a few friends with whom he associates (Tr. 29-30,

47

244); in 2006, an evaluating psychologist noted that Plaintiff had "excellent verbal abstract reasoning and verbal concept formation; he also is shown to have excellent social comprehension and judgment and common sense" (Tr. 213).

Concerning Plaintiff's daily activities, the record shows that he can prepare meals, do shopping, do household chores, and spends a considerable amount of time (i.e., up to two hours at a time) on the computer surfing the internet (Tr. 155, 158-59).

Finally, Plaintiff underwent vocational rehabilitation, which ended a month or two before the May 27, 2009, administrative hearing, which proved unsuccessful, not because of Plaintiff's mental impairments, but "because the job market wouldn't cooperate" (Tr. 33).

Based on these facts in the record, the ALJ did not err by concluding that Plaintiff was not credible as to the disabling nature of his conditions.

### VI. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Next, Plaintiff complains that the ALJ failed to properly arrive at his residual functional capacity, stating:

> The ALJ erred by failing to properly derive a RFC under SSR 96-8p. The ALJ's RFC is unrelated to any specific medical evidence or testimony. The ALJ erred by finding an RFC that did not incorporate sufficient limitations connected to Plaintiff's severe and non-severe impairments. In addition, the ALJ failed to give controlling weight to the Medical Source Statement of Dr. Bhargava in violation of 20 C.F.R. 404.1527(d)(e) and SSR 96-2p.

48

On Plaintiff's residual functional capacity, the ALJ wrote:

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical Vocational Guidelines. 20 CFR Part 404, Subpart P. Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.28. However, the claimant's ability to perform all or substantially all of the requirements of this level or work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative unskilled occupations such as hand packager, medium, with 1,900 in MO and 110,000 nationally; electronics worker, light with 600 in MO and 88,000 nationally; and hand packager, light, with 2,300 in MO and 98,000 nationally.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

49

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 15-16.)

An ALJ "must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). Although formulation of the RFC is part of the medical portion of disability adjudication, it is not based only on "medical" evidence but rather on all the relevant, credible evidence of records. McKinney, 228 F.3d at 863. Assessing a claimant's RFC is not solely a "medical question." Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). The ALJ does not need a medical opinion in the record matching limitations he or she finds in the RFC assessment. Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). Instead, it is for the ALJ, not a physician, to determine a claimant's RFC. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).

Here, we have someone who has never worked, has never expressed any interest in working other than with computers, is young by anyone's standards, is physically healthy except for his

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 50 of 58

weight, whose treating psychiatrist regularly recorded that his medical restrictions were moderate, who regularly sits in front of a computer for two hours at a time without a problem, and who was assessed by an employment services company as being capable of working. Based on this record, the ALJ did not err by finding that Plaintiff's RFC would allow him to work in the national economy.

### VII. TREATING PSYCHIATRIST'S OPINIONS

Next, Plaintiff complains that the ALJ did not give deference to the opinions of his treating psychiatrist, Dr. Elizabeth Bhargava, M.D.

Social Security Ruling (SSR) 96-2p directs that an ALJ give controlling weight to a source's opinion when it satisfies four tests: (1) the opinion comes from a treating source; (2) the opinion is a medical opinion about "the nature and severity" of the claimant's impairments; (3) the opinion is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques"; and (4) the opinion is "'not inconsistent'" with other "'substantial evidence'" in the record.

On the treating psychiatrist's opinions, the ALJ wrote:

> Dr. Bhargava completed disability forms dated September 27, 2007 and February 29, 2008 and indicated that the claimant has bipolar disorder, depressed, ADHD, non-verbal learning disability, and Asperger's disorder, and he would be disabled for 13 or more months (Exhibits 8F and 13F).

> Dr. Bhargava completed a mental medical source statement dated and assessed the claimant with marked limitation in his ability to understand, remember and

51

carry out detailed instructions, and maintain attention and concentration for extended periods, as well as moderate limitations in other areas of understanding and memory, sustained concentration and persistence, social interaction and adaptation (Exhibit 15F).

The undersigned does not give any weight to the assessments from Dr. Bhargava in the disability forms and mental medical source statement because they are not supported by any objective findings, clinical evidence, supportable explanation or discussion of the claimant's treatment response. Dr. Bhargava's assessments are also not consistent with the GAF scores of 55 to 60 that she gave to the claimant. A GAF of 55 indicates moderate symptomatology and/or impairment while a GAF of 60 indicates moderate, bordering on mild, symptomatology and/or impairment. The mental status examinations performed by Dr. Bhargava also were within normal limits except for depressed mood and restricted affect. There was no evidence of significant limitation in the claimant's cognitive functioning or concentration, persistence of pace. The claimant was looking for a job and the treatment notes indicate that the claimant had difficulty landing a job due to his selectivity and prejudice of certain jobs (e.g., working at McDonalds). The undersigned does not give any weight to the GAF scores from the claimant's therapists because they are not supported by any mental status examinations or other objective findings. The GAF scores also fluctuate wildly and have no correlation to the GAF scores given by Dr. Bhargava.

(Tr. 13-14.)

It is undisputed that Dr. Bharagava is a treating source and that she gave an opinion. The question, instead, is whether her opinion that Plaintiff is disabled and unable to perform gainful employment is supported by the doctor's treatment notes and reports, and the other evidence in the record. Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010). The doctor's opinion is not supported by her own records. For example:

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 52 of 58

- On February 22, 2007, the doctor observed that Plaintiff was "stable," his thought process was "coherent," he was "not responding to internal stimuli," and looked "brighter"; and she assessed Plaintiff as "[d]oing much better" (Tr. 244).

- On May 17, 2007, the doctor observed that Plaintiff was "stable," and assessed that he seemed to be doing "well" (Tr. 240).

- On May 8, 2008, the doctor observed that Plaintiff was a little disappointed in his job search, stating that "[a]pparently nobody wants to take the risk of him working on their computers, in spite of him doing a computer class in school. It does seem as if there is some question about his competence. He does admit to having a quick temp[]er. He gets frustrated when his grandmother makes him re-mow the lawn . . . because it was inadequately done."

- On August 8, 2008, the doctor observed that Plaintiff was "stable" and that "[h]e has a good vocabulary and probably has potential if it is channeled the right way" (Tr. 436).

- On October 17, 2008, the doctor observed that Plaintiff was "stable," and assessed him as "[s]till the same" (Tr. 432). The notes reflect that Plaintiff was working but "has grand views about the kind of job he expects" and "is prejudice[d] about going to work at McDonalds" (Tr. 432).

A fair reading of these entries suggests that Plaintiff's lack of substantial work experience has more to do with his level of interest, not his disability.

Additionally, as reflected in the summary of the medical records, Dr. Bhargava's opinion is inconsistent with the GAF scores she assigned Plaintiff in her treatment notes, most of which reflect moderate limitations on Plaintiff's functioning. For example:

53

- On March 29, 2007, the doctor gave Plaintiff a GAF of 65 (Tr. 242).

- On May 17, 2007, the doctor gave Plaintiff a GAF of 64 (Tr. 240).

- On September 27, 2007, the doctor gave Plaintiff a GAF of 58 (Tr. 457).

- On January 18, 2008, the doctor gave Plaintiff a GAF of 60 (Tr. 446).

- On May 8, 2008, the doctor gave Plaintiff a GAF of 60 (Tr. 440).

- On August 8, 2008, the doctor gave Plaintiff a GAF of 60 (Tr. 436).

- On October 17, 2008, the doctor gave Plaintiff a GAF of 55 (Tr. 432).

- On March 6, 2009, the doctor gave Plaintiff a GAF of 55 (Tr. 430).

On March 18, 2009, Dr. Bhargava completed a medical source statement in which she opined that Plaintiff was markedly limited in his ability to understand and remember details, his ability to carry out detailed instructions, and his ability to maintain attention and concentration for extended periods (Tr. 487). This opinion is not supported by the medical evidence. Plaintiff was evaluated on August 7, 2006, by Behavioral Healthcare, and was found to have a verbal IQ of 127, a performance IQ of 102, and a full-scale IQ of 109 (Tr. 213). As to maintaining attention and concentration, Plaintiff has stated that he has ability to stay on the computer for periods up to two hours at a time without problem (Tr. 156). Finally, between May 2, 2008, and May 30, 2008,

54

plaintiff was evaluated by an employment services company (Tr. 468-72). In that report, the evaluator noted that Plaintiff "exhibited good work quality during the assessment activities" (Tr. 469). However, the evaluator also noted that Plaintiff was only interested in working at a computer store (Tr. 468), which is an unrealistic goal given his lack of training in the area (Tr. 470). The assessor wrote:

> Plaintiff is very selective regarding his employment opportunities. He was not willing to try any other type of work skills except clerical during assessment. At first William would not agree to any CBA's other than at a computer store. However, when staff explained the employers at the computer store expresses liability issues he was willing to compromise to working at the church and AO office performing clerical duties.

(Tr. 468.) This information significantly detracts from Dr. Bhargava's opinion that Plaintiff is unable to work.

### VIII. VOCATIONAL EXPERT'S TESTIMONY VERSUS DOT

Finally, Plaintiff complains that the ALJ failed to resolve a conflict between the vocational expert's testimony at the administrative hearing and the DOT Dictionary of Occupational Titles, stating:

> The ALJ violated SSR 00-4p in not resolving the conflict between the VE's testimony and the DOT. The VE testified that Plaintiff could perform the jobs of hand packager, both at the medium and light level and electronics worker. Those jobs require a reasoning level of at least 2, meaning that one must possess the ability to apply understanding to carry out detailed instructions, which would not be compatible with the limitation of simple, routine, repetitive tasks, which was a part of the ALJ's RFC.

55

Concerning the vocational expert's testimony, the ALJ wrote:

> Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 16.)

The vocational expert testified that her testimony was consistent with the DOT (Tr. 36). When asked a hypothetical question largely consistent with the ALJ's RFC findings, the vocational expert responded that such a person could perform the medium, unskilled job of hand packager and the light, unskilled jobs of hand packager and electronic worker (Tr. 34-36).[68] Pursuant to the DOT, these jobs have a reasoning level of two, requiring the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with

---

[68]Defendant notes that the hypothetical question contained the limitation of occasional crawling, while the RFC assessment indicated Plaintiff could never crawl (Tr. 12, 35). This difference is inconsequential because the jobs the vocational expert identified do not require crawling. See DOT 920.587-018; 726.687-010; 559.687-074. Other differences between the hypothetical question and the RFC assessment do not affect the ALJ's conclusion that Plaintiff could perform other work in the national economy because they involve more restrictive limitations in the hypothetical question than in the RFC assessment (Tr. 12-13, 34-35).

56

problems involving a few concrete variables in or from standardized situations." DOT Appendix CIII.

Specifically, Plaintiff argues that level two reasoning is inconsistent with the vocational expert's response to the ALJ's hypothetical question, which included a limitation to "simple, routine, repetitive tasks" (Tr. 35).

The Eighth Circuit dealt with this argument in a similar case. Moore v. Astrue, 623 F.3d 599, 604 (8th Cir. 2010). In Moore, the plaintiff argued that the hypothetical question posed to the vocational expert included language that the plaintiff could carry out simple instructions and perform simple, routine, and repetitive work at an unskilled level; but in response to the question, the vocational expert identified jobs that, according to the DOT, required "Level 2" reasoning or the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." DOT, p. 1011. Therefore, the plaintiff in Moore argued, the hypothetical question could only be satisfied by jobs at "Level 1" reasoning (i.e., the ability "to carry out simple one-or-two-step instructions.") Id.

The Eighth Circuit found "no direct conflict between 'carrying out simple job instructions' for 'simple, routine and repetitive work activity,' as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated

57

or intricate." <u>Moore</u>, 623 F. 3d at 604.

Therefore, the vocational expert's testimony that Plaintiff could perform other work in the national economy constitutes substantial evidence supporting the Commissioner's decision. <u>Gragg v. Astrue</u>, 615 F.3d 932, 941 (8th Cir. 2010).

## *XI. CONCLUSIONS*

Therefore, based on the above analysis, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


<u>/s/ Robert E. Larsen</u>
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 27, 2012

Case 6:10-cv-03349-REL   Document 11   Filed 02/28/12   Page 58 of 58